RECEIPT # _53744_
AMOUNT $_150 00_
SUMMONS ISSUED _Y-2_
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. __M__
DATE_____ _2-11-04_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORGE HARRISON, On Behalf of Himself and All Others Similarly Situated, ) ) ) | Civ. No. |
| *Plaintiff,* ) ) | CLASS ACTION |
| vs. ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| IBIS TECHNOLOGY CORP, and MARTIN J. REID, ) ) ) | |
| *Defendants.* ) ) | DEMAND FOR JURY TRIAL |

# 04 CV 10286 RCL

MAGISTRATE JUDGE _Dein_

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ibis Technology Corp. ("Ibis" or the "Company"), securities analysts reports about the Company, press releases issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of Ibis between October 2, 2003 and December 12, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. § 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information occurred in substantial part in this District. Additionally, defendants maintain their chief executive office and principal place of business within this District.

## PARTIES

6.    Plaintiff, George Harrison, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Ibis during the Class Period and has been damaged thereby.

7.    Defendant Ibis is organized under the laws of Massachusetts and maintains its principal executive offices at 32 Cherry Hill Drive, Danvers, Massachusetts 01923.  Ibis manufactures and sells bath SIMOX-SOI oxygen implantation equipment (the "implanter") and SIMOX-SOI wafers for the worldwide semiconductor industry.  The second-generation Ibis implanter, the i2000, makes the wafers and sells for approximately $8 million.  The i2000 implanter was developed by Ibis but uses IBM's patented intellectual property.  IBM is also Ibis' largest customer for its wafers. For the six months ended June 30, 2003, IBM accounted for $12,140,000 in revenue dollars or 92% of Ibis' total revenues.  In that period, IBM purchased

one implanter at a cost of $8 million and virtually all of the wafers manufactured by Ibis. Ibis sold no other implanters in the six months ended June 30, 2003.

8.    Defendant Martin J. Reid ("Reid") was Ibis' Chief Executive Officer, President and Chairman of the Board throughout the Class Period. Reid authorized the filing of the Company's amendment no. 3 to the registration statement pursuant to SEC Form S-3 dated October 2, 2003 ("Registration Statement") and the Company's Prospectus Supplement to the Registration Statement filed on October 16, 2003 ("Prospectus"), signed and certified the Company's SEC Form 10-Q for the Third Quarter of 2003, filed November 4, 2003 ("Q3 10-Q"), and was the principal spokesperson for Ibis, quoted in the Company's press releases dated October 17, 2003 and October 22, 2003.

9.    During the Class Period, Reid, as the senior executive officer and Chairman of Ibis, was privy to confidential and proprietary information concerning Ibis, its operations, finances, financial condition, present and future business prospects, including its relationship with IBM. Reid, consequently, had access to material adverse non-public information concerning Ibis via, inter alia, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of his possession of such information, Reid knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.    Each defendant is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, Reid, by reason of his positions at Ibis was a "controlling person" within the meaning of Section 20 of the Exchange Act and had the

power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his positions of control, Reid was able to and did, directly or indirectly, control the conduct of Ibis' business. Reid also controlled and/or possessed the authority to control the contents of Ibis' SEC filings reports and press releases and, as alleged above, was provided with and/or signed the Company's SEC filings and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be connected. Thus, Reid had the ability to correct the misleading statements contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Ibis between October 2, 2003 to December 12, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest and the underwriters of Ibis' October 2003 common stock offering.

12.     The members of the Class are so numerous that joinder of all members is impracticable. As of October 21, 2003, Ibis had approximately 10.4 million shares of common stock outstanding, which were actively traded on the NASDAQ throughout the Class Period. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ibis, its underwriters or its transfer agent and may be

notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

13.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

     (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Ibis; and

     (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

17.    Ibis has built its business on the SIMOX-SOI (i.e. separation by implantation of oxygen) technology to position itself in the semiconductor market as the company with the leading new technology for the manufacture of wafers. SOI (i.e. silicon-on-insulator) is a new technique in chip design. Pursuant to its strategy, Ibis developed a SIMOX-SOI implanter for the creation of the SIMOX-SOI wafers. Ibis' newer generation implanter, the i2000, uses and is dependent upon IBM's patented intellectual property. Each i2000 implanter costs approximately 8 million ("equipment revenue"). Ibis also creates and sells the SIMOX-SOI wafers themselves, which are made in different sizes using different production equipment ("product sales"). For the six months ended June 30, 2003, Ibis reported product sales revenues of $4.2 million and equipment revenues of $8.4 million. IBM accounted for 92% of these aggregate revenues.

18.    By the beginning of the Class Period, defendants had determined to become the dominant supplier of oxygen implantation equipment to silicon wafer manufacturers so that they could then, using the implanters, create and sell the SOI wafers to their customers. Consequently, as set forth in Ibis' Prospectus at page S-9, defendants stated that, "[i]n the future we will continue to supply small quantities of wafers for test and evaluation purposes, but our primary emphasis will be on implanter sales and support. We also plan on continuing process development for SIMOX-SOI wafers." Since 2001, Ibis put its principal focus on developing capacity to produce larger size 800 mm wafers, as compared to the 200 mm smaller size wafers. Each size wafer requires a separate production line. The wafer production lines are valued separately and the carrying value of each production line is included in Ibis' financial statements. In order to accomplish its goal of developing capacity to create 300 mm wafers, Ibis had to develop a new generation of implanter, which it called the i2000, to accommodate the larger size 300 mm wafers. Ibis sold only one i2000 implanter before the start of the Class Period and that

sale was to IBM whose proprietary technology is used in the i2000 implanter. Prior to the development of the i2000 implanter, Ibis had sold two prior generation implanters, known as the 1000 implanter, to IBM in 2000 for approximately $4 million and to Simgui in 2002 for approximately $5 million.

19.    By the beginning of the Class Period, defendants also determined to take advantage of the run-up in the price of Ibis' common stock which went from a low of $3.90 in the second quarter of 2003 to a high of $13.17 in the third quarter of 2003. Much of this price increase was the result of defendants' hyping of the SIMOX-SOI technology and the attributes of the next generation i2000 implanter, Ibis' receipt of new orders for the i2000 implanter from Japanese wafer manufacturers that defendants stated would close by December 31, 2003 and Ibis' ability to continue to record significant revenues from sales of all wafer sizes.

20.    Unbeknownst to the market and to the public investors, Ibis was in a very precarious financial and operating position. The right of Ibis to use IBM's proprietary technology in the development and sale of Ibis' new generation i2000 implanter was the subject of undisclosed ongoing negotiations between Ibis and IBM, which threatened the ability of Ibis to sell the i2000 implanter. Because of IBM's patented technology, sales of the i2000 implanter to a third party required a license from IBM for the use of the technology. Licensing of the technology from IBM was uncertain, particularly since Ibis' potential customers were competitors of IBM.

21.    Typically, a licensing agreement is created and purchasers of the product using patented technology are required to execute the licensing agreement before they can purchase the equipment. IBM itself had not agreed to any licensing agreement that would allow sales to third party purchasers of the i2000 implanter from Ibis before or during the Class Period.

Consequently, defendants knew that they could not sell any i2000 implanters to third parties until a licensing agreement was agreed to between IBM and Ibis. Thereafter, any prospective purchasers would be required to agree to the terms and conditions of the licensing agreement. As a result, defendants' statements to the market that they had received orders for between one and three i2000 implanters from Japanese wafer manufacturers and that the sales would close before December 31, 2003 were false and misleading because of the failure to disclose that a license was required from IBM.

22.     Defendants had no basis for knowing at the time they made their statements whether or when they would reach agreement with IBM on the terms and conditions of a licensing agreement and, then, whether the Japanese manufacturers would agree to the terms and conditions of the licensing agreement with IBM and then actually purchase the i2000 implanter from Ibis.

23.     At the close of the Class Period, in a Form 8-K filed with the SEC on December 15, 2003, defendants admitted that no sales of the i2000 implanter would occur until sometime in 2004 because, "[t]he exact timing is very difficult to predict because it is dependent on the customer(s) entering into a license agreement with a third party." Although defendants did not disclose the name of the third party, it is IBM. Defendants further admitted that they no longer even had the orders they said they had in hand. Instead, defendants stated that they expected to receive an order(s) for one to three i2000 implanters in the first half of 2004 with, according to the Prospectus, actual customer acceptance historically taking "approximately nine months." Only at the end of that period would revenue for the sale be recognized. With this belated disclosure by defendants of material facts known or recklessly disregarded by them, the market now knew that Ibis' equipment revenues from the sales of i2000 implanters in the fourth quarter

of 2003 would be zero, where it had been expecting, based on defendants' false and misleading statements during the Class Period, that Ibis would record revenues of between $8 million and $24 million from the sales of the i2000 implanter in the fourth quarter of 2003, ended December 31, 2003 ("Q4 2003").

24.     The true state of Ibis' precarious financial condition was further hidden by defendants from the market. Defendants knew, as a result of customer forecasts, orders received to date, inventories, and the shift in the market to 300 mm size wafers, that sales of the 200 mm and smaller size wafers to IBM, virtually its only customer for the wafer product, would be significantly reduced in Q4 2003. Defendants knew from customer forecasts and as a result of its close working relationship with IBM, that IBM would be greatly reducing its purchases of 200 mm and smaller size wafers to approximately only $1 million, down from $2.7 million recorded in Q4 2002 because of reduced demand, orders, sales and bloated inventories. Consequently, defendants knew that Ibis would be required under GAAP to write down the carrying value on Ibis' financial statements of its smaller size wafer production line. Defendants did not make timely disclosure of these material facts and, instead, affirmatively misrepresented to the market in November 2003 that there was no impairment to the value of the 200 mm and smaller size wafer production line and that there would not likely be any impairment for at least two to three years, if at all.

25.     Rather than make truthful disclosure of Ibis' adverse financial and operating condition, defendants embarked on a scheme to close on Ibis' public offering of common stock at an inflated price and hide from the market and members of the class the material problems facing Ibis.

26.    During the Class Period, defendants issued numerous statements concerning Ibis' business and financial results. These positive representations were materially false and misleading because defendants failed to disclose and misrepresented the following material adverse facts:

(a)    that demand for Ibis 200 mm and smaller size wafers was in dramatic decline and that its major customer, IBM, who accounted for virtually all of such product revenues, would purchase only approximately $1 million of such product in Q4 2003, compared to $2.7 million in purchases of such product in Q4 2002;

(b)    that because of the facts alleged in subparagraph (a) above and the known reduction in demand in the marketplace for the 200 mm and smaller size wafers, as alleged above, Ibis would be required under GAAP to write down in material amount the value of the 200 mm and smaller size wafer production line it carried on its financial statements;

(c)    that Ibis had not agreed upon the terms and conditions of a licensing agreement with IBM with respect to IBM's patented technology used by Ibis in the manufacture of the i2000 implanter, and upon which the i2000 was dependent, that Ibis was involved in negotiations with IBM and that defendants were not in any position to know if and when it and IBM would agree on the terms and conditions of a licensing agreement;

(d)    that until Ibis and IBM had agreed upon the terms and conditions of a licensing agreement and any potential purchaser of the i2000 implanter agreed with IBM to the terms of the licensing agreement, defendants were not able to close on the sale of its i2000 implanter to any purchaser other than IBM, which had not ordered any additional i2000 implanters;

350228

(e)    that defendants lacked any reasonable basis for their statements to the market that the orders Ibis had received for one to three i2000 implanters from Japanese wafer manufacturers would close by December 31, 2003, in light of the facts alleged in subparagraphs (c) and (d) herein. In addition, defendants knew that there was a substantial probability that those orders would be withdrawn pending the Japanese purchasers' decisions whether and when to agree to the terms of any licensing agreement that Ibis might enter into with IBM; and

(f)    that as a result of the foregoing, defendants lacked a reasonable basis for their statements made during the Class Period concerning the Company's prospects, earnings and value, as alleged hereinafter.

27.    Defendants were motivated to conceal and delay disclosure of the adverse material facts detailed herein in order to maintain and inflate the price of Ibis common stock so that the Company could close on an offering of its common stock in October 2003 in order to generate desperately needed monies to fund its operations, with working capital of only $3.785 million at June 30, 2003, its lowest point in three years, Ibis' planned stock offering was for 1 million shares and was to raise net proceeds of approximately $11 million.

28.    During the Class Period, defendants made the following misrepresentations of material fact. On October 2, 2003 Ibis filed the Registration Statement for the upcoming public offering of its common stock and on October 16, 2003 defendants filed the Prospectus for the stock offering. Nowhere in these SEC-filed documents did defendants disclose the material adverse facts alleged above. To the contrary, defendants portrayed Ibis in a misleading light and misrepresented the known and available facts in, inter alia, the risk disclosure sections of the Registration Statement and Prospectus where defendants discussed numerous "risks" associated

with Ibis and technology, products, customer base, patents and proprietary technology, and quarterly earnings.

(a)    Defendants misrepresented and did not disclose the existing material facts that Ibis would not be able to sell the i2000 implanter to any third party until Ibis had resolved the existing patent issues with IBM, that Ibis and IBM had not come to agreement on the terms and conditions of a licensing agreement that would have to be entered into by the purchaser of the i2000 implanter from Ibis and that it was probable that Ibis would not be able to close on the sales of the i2000 implanter ordered by Japanese wafer manufacturers that defendants told the market to expect would be closed by December 31, 2003;

(b)    Defendants misrepresented and did not disclose the existing material fact that because demand for 200 mm and smaller size wafers was down, which defendants knew as the result, inter alia, of customer forecasts, and IBM was purchasing those wafers in greatly reduced amounts in Q4 2003, beginning October 1, 2003 (more than two weeks before the offering commenced), that Ibis' revenues for Q4 2003 would be significantly reduced and reduced further by the fact that the 200 mm and smaller size wafer production line Ibis carried on its financial statements was materially impaired and would have to be written down by December 31, 2003.

(c)    Defendants misrepresented and did not disclose, in the discussion of IBM as a significant customer, the existing material facts of the patent issue as alleged hereinbefore, including the material facts that no licensing agreement permitting Ibis to sell the i2000 implanter to third parties had been agreed to, that the negotiations of the terms and conditions of the licensing agreement were ongoing, and that the Japanese wafer manufacturers that had placed order(s) for the i2000 implanter had not seen the licensing agreement that they would be required

to execute with IBM before they could complete their purchases from Ibis because the licensing agreement did not yet exist.

29.    The next day, on October 17, 2003, with Ibis' common stock price artificially pumped up to over $14 per share, defendants issued a press release announcing the public offering of 1 million shares of Ibis common stock, and on October 21, 2003, Ibis issued another press release announcing that the stock offering had closed and that Ibis netted proceeds of approximately $12.7 million.

30.    On October 22, 2003, defendants issued a press release announcing Ibis' results for the third quarter of 2003, the three months ended September 30, 2003. Ibis described itself as the leading provider of SIMOX-SOI implantation equipment and wafers to the semiconductor industry and reported the sale of one i2000 implanter for approximately $8 million. Defendant Reid was quoted in the press release:

> We are very pleased to announce another quarter of record wafer sales . . . Wafer sales for the third quarter were $3.7 million, up from the previous quarter's $3.5 million. Most of the wafers shipped were 300 mm wafers . . . and we are now shipping wafers produced using the newest SIMOX-SOI process that was developed under the auspices of a joint development agreement with our largest customer.
>
> We are also pleased with the progress being made on the equipment side of our business. Significant improvements and upgrades have been made in our i2000 implanter in recent months. . . As a result, both throughput and wafer quality are improved, further strengthening the position of SIMOX-SOI as the economical SOI solution.

In addition, defendant Reid commented on the Company's outlook, stating that:

> Although we anticipate a fourth quarter slowdown for 300 mm wafer business at our largest customer, forecasts from this customer and others for 2004 continue to look positive. During the fourth quarter our priority on the wafer side of the business will be to broaden our customer base in both 300 mm and 200 mm by sampling our latest IMOX-SOI wafers. We are currently undergoing 200 mm evaluation at two customers and positive results should translate to orders in early 2004. Forecasting future wafer sales, on a quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely. We

also continue to anticipate booking orders for one-to-three implanters during the fiscal year.

31.    The statements quoted above from the October 22, 2003 press release were false and misleading because they failed to disclose the material facts alleged above, and were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)    that IBM had reduced its orders for and purchases of 200 mm and smaller size wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003; and

(b)    that the Company had no reasonable expectation that it would be able to close on – or "book" – the orders for i2000 implanters from Japanese wafer manufacturers in fiscal 2003 because of the patent issues with IBM, including the lack of any agreement on the terms and conditions of a licensing agreement with IBM which purchasers of the i2000 implanter would be required to enter into as a prerequisite to purchasing an i2000 implanter from Ibis;

(c)    that the carrying value of Ibis' 200 mm and smaller size wafer production line was materially impaired and that Ibis would be required to take a material charge to earnings in Q4 2003; and

(d)    that as a result of the foregoing, defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

32.    On November 4, 2003, defendants filed Ibis' Q310-Q. Statements made in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD & A"), including the following, were false and misleading:

In 2002, we introduced the next generation of SIMOX-SOI technology which included our second-generation oxygen implanter (i2000) . . . licensed to Ibis by IBM.

* * *

> Although our 200 mm and smaller wafer size production line is currently underutilized, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time. However, if our future current process cycle (which typically lasts two or three years) or our customer transition to the 300 mm wafer size [happens] sooner than we anticipate, our 200 mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which would be material.

These statements were false and misleading because they failed to disclose the material facts alleges in paragraphs 20, 21 and 23 above, and were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others.

(a)    that IBM had reduced its orders and purchases for 200 mm and smaller size wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003; and

(b)    that the Company had no reasonable expectation that it would be able to close on – or "book" – the orders for implanters from Japanese wafer manufacturers in fiscal 2003 because of the patent issues with IBM, lack of any licensing agreement and the state of the ongoing negotiations;

(c)    that the carrying value of Ibis' 200 mm and smaller size wafer production line was materially impaired and that Ibis would be required to take a material charge to earnings in Q4 2003; and

(d)    that as a result of the foregoing, defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

## The Truth Emerges

33.    On December 15, 2003, as year end approached and defendants knew they would not be able to report any sales of the implanter and would have to write down the value of its 200 mm and smaller size wafer production line, defendants made the disclosure that Ibis' fourth quarter wafer product revenues would be reduced to approximately $1 million, down from $2.7

million in the prior year's fourth quarter, due to reduced purchases by its largest customer (although defendants did not name the customer it is IBM) and that Ibis would be taking a "material charge" due to the impairment of its smaller size wafer production equipment as Ibis was increasing its emphasis on the production of large wafers as the result, in part, of its customer forecasts.

34.    On December 15, 2003, defendants filed a Form 8-K with the SEC admitting that there would be no sales of i2000 implanters in Q4 2003 to the Japanese wafer manufacturers and that they now expected to receive order(s) for one to three i2000 implanters sometime in 2004 but that the timing of the orders "is very difficult to predict because the sales require the purchaser to enter into a license agreement with a third party" whose name, although not disclosed by defendants, is IBM.

35.    In reaction to the announcement on December 15, 2003, the price of Ibis' common stock fell from a $15.40 per share close on December 12 to a close of $13.20 per share on December 15, 2003 and a closing price of $10.37 on December 16, 2003, on extraordinarily high combined volume of 4.4 million shares, almost 50% of the outstanding shares of Ibis common stock.

## ADDITIONAL SCIENTER ALLEGATIONS

36.    As alleged herein, defendants acted with scienter in that defendants knew that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Ibis, IBM, its largest customer and owner of the patented technology involved in